Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Michael Vanunu (MV 4167)
Philip Nash (PN 0519)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and                   Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

                              Plaintiffs,

              -against-                                    **Plaintiff Demands a Trial by Jury**

MED EQUIPMENTS SERVICE, INC., ZINOVY
AYZENBERG, RICHARD APPLE, M.D., CLIFTON
BURT, M.D., EMIL STRACAR, M.D. and JOHN DOE
DEFENDANTS 1-10,

                            Defendants.
---------------------------------------------------------------X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

### <u>INTRODUCTION</u>

    1.    This action seeks to recover more than $375,000.00 that the Defendants have

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise

unreimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment") through Defendant, Med Equipments Service, Inc. ("Med Equipments").

2.      Med Equipments is a retailer of DME and OD that is owned, operated and controlled by Zinovy Ayzenberg ("Ayzenberg"). In short, Ayzenberg devised a scheme in conjunction with various healthcare providers, including Defendants Richard Apple, M.D. ("Apple"), Clifton Burt, M.D. ("Burt"), and Emil Stracar, M.D. ("Stracar"), either directly or through others who are not readily identifiable to GEICO, to submit large volumes of billing to GEICO and other New York automobile insurance companies for purportedly providing Fraudulent Equipment that was medically unnecessary, illusory, and otherwise not reimbursable.

3.      Based upon prescriptions for Fraudulent Equipment issued by various healthcare providers, including Apple, Burt, and Stracar (collectively, the "Referral Defendants"), Med Equipments and Ayzenberg (collectively the "Supplier Defendants") allegedly provided Fraudulent Equipment to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

4.      GEICO seeks to recover more than $375,000.00 that has been wrongfully obtained by the Supplier Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $575,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Med Equipments because:

> (i)     The Supplier Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements between the Defendants and other health care providers – either directly or through third-party individuals not presently identifiable.

2

(ii)     The Supplier Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and provided – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols with healthcare providers, including the Referral Defendants – either directly or through third-party individuals not presently identifiable – solely to financially enrich the Defendants, other healthcare providers, and others not presently known, rather than to treat the Insureds.

(iii)    The Supplier Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referral Defendants or other healthcare providers who are licensed to issue such prescriptions.

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Supplier Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent what was provided to Insureds.

(v)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Supplier Defendants fraudulently and grossly inflated the permissible reimbursement rate that the Supplier Defendants could have received for the Fraudulent Equipment.

5.     The Defendants fall into the following categories:

(i)     Defendant Med Equipments is a New York corporation that purports to purchase DME and OD from wholesalers, purports to provide Fraudulent Equipment to automobile accident victims, and bills New York automobile insurance companies, including GEICO, for Fraudulent Equipment.

(ii)    Defendant Ayzenberg owns, operates and controls Med Equipments, and uses the corporation to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(iii)   Defendants Apple and Burt are physicians licensed to practice medicine in New York and issued prescriptions for Fraudulent Equipment in the names of automobile accident victims that received treatment at a multi-disciplinary medical office located at 1655 Richmond Avenue, Staten Island, New York, which in turn were provided to and billed by the

Supplier Defendants to New York automobile insurance companies, including GEICO.

(iv) Defendant Stracar is a physician licensed to practice medicine in New York and issued prescriptions for Fraudulent Equipment in the name of automobile accident victims who received treatment at a multi-disciplinary medical office located at 2050 Eastchester Road, Bronx, New York, which were in turn provided to and billed by the Supplier Defendants to New York automobile insurance companies, including GEICO.

6. As discussed below, the Defendants always have known that the claims for

Fraudulent Equipment submitted to GEICO were fraudulent because:

(i) The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – as a result of unlawful financial arrangements between the Defendants and other health care providers – either directly or through third-party individuals not presently identifiable – and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(ii) The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols designed by the Defendants and other healthcare providers – either directly or through third-party individuals not presently identifiable – solely to financially enrich the Defendants, other healthcare providers, and others not presently known, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii) The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referral Defendants or other healthcare providers who are licensed to issue such prescriptions;

(iv) To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Supplier Defendants to GEICO – and other New York automobile insurers – fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds; and

(v) To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Supplier Defendants to GEICO – and other New York automobile insurers – fraudulently and

4

grossly inflated the permissible reimbursement rate that the Supplier Defendants could have received for the Fraudulent Equipment.

7.       As such, the Supplier Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Med Equipments.

8.       The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme.

9.       Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than January 1, 2015 and the scheme has continued uninterrupted since that time.

10.      As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $375,000.00.

## THE PARTIES

**I.      Plaintiffs**

11.      Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

**II.     Defendants**

12.      Defendant Med Equipments is a New York corporation with its principal place of business in Brooklyn, New York. Med Equipments was incorporated on September 2, 2008, is owned, operated and controlled by Ayzenberg, and has been used by Ayzenberg, with the

assistance of the Referral Defendants and others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.     Defendant Ayzenberg resides in and is a citizen of New York.  Ayzenberg is not and has never been a licensed healthcare provider. Ayzenberg owns and controls Med Equipments and entered into unlawful financial arrangements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals not presently identifiable, in exchange for referrals to Med Equipments for the Fraudulent Equipment.

14.     The Supplier Defendants are no strangers to fraudulent schemes against automobile insurers and have engaged in schemes against other New York automobile insurance carriers, including one nearly identical to the scheme identified here as being committed against GEICO.

15.     Defendant Apple resides in and is a citizen of New York. Apple became licensed to practice medicine in New York on or about May 2, 1989. Apple purportedly treated automobile accident victims at a multi-disciplinary medical office that catered to a high volume of no-fault insurance patients located at 1655 Richmond Avenue, Staten Island, New York ("the Richmond Ave Clinic"). Apple was one of multiple healthcare providers who issued large numbers of prescriptions for Fraudulent Equipment from the Richmond Ave Clinic that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

16.     Apple is no stranger to regulatory actions regarding his treatment and care of patients. For example, in 2005, Apple was charged with professional misconduct by New York's Office of Professional Medical Conduct by failing to document the presence and/or absence of any pertinent family history of anesthesia problems; and on one occasion failing to enter vital

signs while a patient was administered anesthesia during a procedure. For these actions, on or about August 22, 2005, Apple was placed on a one-year term of probation and directed to take an additional continuing education course on record keeping.

17.     Defendant Burt resides in and is a citizen of New Jersey. Burt became licensed to practice medicine in New York on or about January 23, 2009. Burt also purportedly treated automobile accident victims at the Richmond Ave Clinic, and was one of multiple healthcare providers who collectively issued a substantial amount of prescriptions for Fraudulent Equipment from the Richmond Ave Clinic that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

18.     Burt is also no stranger to illicit conduct. For example, between at least May 2008 and October 2008, Burt prescribed controlled substances – including hydrocodone and zolpidem (the generic form of Ambien) – over the internet to individuals he never met, let alone medically treated. For these actions, Burt was charged with professional misconduct by the Virginia Board of Medicine, New Jersey State Board of Medical Examiners, and New York's Office of Professional Medical Conduct. Burt admitted his wrongdoing in prescribing controlled substances over the internet, which resulted in a public reprimand by each State's board of professional medical conduct and fines in New York and Virginia. In addition, the Federal Drug Enforcement Administration revoked Burt's DEA registration on April 8, 2011.

19.     Defendant Stracar resides in and is a citizen of New York. Stracar became licensed to practice medicine in New York on or about April 21, 1992. Stracar purportedly treated automobile accident victims at a multi-disciplinary medical office that catered to a high volume of no-fault insurance patients located at 2050 Eastchester Road, Bronx, New York ("the Eastchester Road Clinic"), and issued many prescriptions for Fraudulent Equipment that were

provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

21.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

22.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

24.     GEICO underwrites automobile insurance in the State of New York.

I.     **An Overview of the Pertinent Laws**

A.     **Pertinent Laws Governing No-Fault Insurance Reimbursement**

25.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

26.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R.

§§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

27.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

28.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

29.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

30.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

31.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509(10), 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

32.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial

gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509(10), 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

33.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

34.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

35.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

36.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

37.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME and OD**

38.      Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

39.      DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

40.      OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee supports, ankle supports, wrist braces, and the like.

41.      To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

42.     In a June 16, 2004 Opinion Letter, which is attached as Exhibit "2", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

43.     As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2

44.     As indicated by the New York Fee Schedule, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

45.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule"). Alternatively, where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as

GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

46.      For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See Exhibit "2".

47.      For Fee-Schedule items, Noridian Healthcare Solutions, LLC ("Noridian"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

48.      The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Noridian. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Noridian.

49.      To the extent that bills for No-Fault Benefits are for dispensed DME and/or OD that are Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME

Procedure Codes, the definitions for set forth by Noridian control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

50.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Noridian published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Noridian has identified who is qualified to properly provide custom-fitted OD.

51.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

> (i)     The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

> (ii)    The prescription for DME or OD is not based any unlawful financial arrangement;

> (iii)   The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

> (iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

> (v)     The fee sought for the DME or OD was not in excess of either the Medicaid Fee Schedule or the standard for a Non-Fee Schedule item.

## II.     The Defendants' Fraudulent Scheme

52.     Beginning in or about January 2015, the Defendants masterminded and implemented a complex fraudulent scheme in which Med Equipments was used as a vehicle to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

A.      **Overview of the Defendants' Fraudulent Schemes**

53.      Between May 1, 2015 and the present, the Supplier Defendants, through Med Equipments, submitted more than $1,300,000.00 in fraudulent claims to GEICO seeking reimbursement for the Fraudulent Equipment. To date, the Supplier Defendants have wrongfully obtained more than $375,000.00 from GEICO, and there is more than $575,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Supplier Defendants continue to seek payment of from GEICO.

54.      Ayzenberg used Med Equipments to directly obtain No-Fault Benefits and maximize the amount of No-Fault Benefits he could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for a combination of Fee Schedule items and Non-Fee Schedule items.

55.      As part of this scheme, the Supplier Defendants obtained generic and vague prescriptions (which were written in that manner by design) for Fraudulent Equipment from the Referral Defendants and other healthcare providers who treated Insureds at multi-disciplinary medical offices in the New York metropolitan region that cater to high volumes of no-fault insurance patients, including the Richmond Ave Clinic.

56.      Once the Supplier Defendants received the intentionally vague and generic prescriptions from healthcare providers, including the Referral Defendants, the Supplier Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items with HCPCS Codes that were not directly identified in the prescriptions.

57.      By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Supplier Defendants indicated that they

provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

58.     However, in a substantial majority of the charges for Fee Schedule items identified in Exhibit "1" – to the extent that any Fraudulent Equipment was actually provided to the Insureds – the Fraudulent Equipment for Fee Schedule items did not match the HCPCS Codes identified in the bills submitted to GEICO by the Supplier Defendants.

59.     As part of this scheme, the Supplier Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment that did not contain all the features required by the applicable HCPCS Codes for Fee Schedule items, to the extent that any Fraudulent Equipment was provided to the Insureds in the first instance.

60.     For example, in many instances, the Supplier Defendants used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of Fee Schedule items that could be provided to the Insureds. Then, the Supplier Defendants submitted bills to GEICO that indicated the Supplier Defendants provided the Insureds with a variation that had a high maximum reimbursement rates under the Medicaid Fee Schedule.

61.     However, the Fee Schedule items actually provided did not match the HCPCS Codes identified in the bills to GEICO as the items were of inferior quality and without the specific features required by the applicable HCPCS Codes.

62.     Instead, the Fee Schedule items actually provided to Insureds – and again to the extent that any Fraudulent Equipment was actually provided – would qualify under different HCPCS Codes that had significantly lower maximum reimbursement rates than the HCPCS Codes identified in the bills submitted by the Supplier Defendants.

63.     In addition, in many circumstances, the bills submitted by the Supplier Defendants contained HCPCS Codes that did not relate to the Fraudulent Equipment purportedly provided – let alone the DME and/or OD that was prescribed.

64.     For example, the Supplier Defendants submitted bills using HCPCS Codes identifying Fee Schedule items when the items provided were Non-Fee Schedule items with significantly lower reimbursement rates than the HCPCS Codes for Fee Schedule items in the bills.

65.     Similarly, the Supplier Defendants submitted bills using HCPCS Codes identifying Non-Fee Schedule items, when the items provided were Fee Schedule items with lower reimbursement rates than the rates contained in the bills submitted to GEICO.

66.     The Supplier Defendants engaged in a pattern of submitting bills to GEICO, and other automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

67.     In furtherance of their scheme to defraud GEICO, and other automobile insurers, the Supplier Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of the Supplier Defendants' legitimate acquisition cost or the cost to the general public for the same item.

68.     In actuality, the bills from the Supplier Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Supplier Defendants' legitimate acquisition cost or the cost to the general public.

69.     As part of this scheme, the Supplier Defendants submitted bills to GEICO with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided Insureds were expensive and high-quality when the Non-Fee Schedule items provided were cheap and poor-quality, and were purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

70.     In fact, the cheap and poor quality Non-Fee Schedule items provided to the Insureds – again, to the extent that any Non-Fee Schedule item was actually provided – were easily obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by the Supplier Defendants.

71.     The Supplier Defendants submitted bills to GEICO, and other automobile insurers, seeking No-Fault Benefits for Non-Fee Schedule items at rates that were grossly above the permissible reimbursement amount for Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits that they could receive.

72.     The Supplier Defendants were able to perpetrate this scheme due to secret agreements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals who are not presently identifiable.

73.     Upon information and belief, in exchange for various forms of consideration from the Supplier Defendants – either directly or through third-party individuals who are not presently identifiable – the Referral Defendants and other healthcare providers would regularly and intentionally provide the same type of prescriptions for generic and vague Fraudulent Equipment to virtually every Insured that was injured in a motor vehicle accident. Thereafter, someone on behalf of the Referral Defendants and other healthcare providers would typically – without going through the Insureds – provide the prescriptions to the Supplier Defendants.

74.     By providing generic and vague prescriptions to the Supplier Defendants, the Referral Defendants and other healthcare providers intentionally enabled the Supplier Defendants to bill GEICO for: (i) Fraudulent Equipment that were not reasonable or medically necessary; (ii) Fraudulent Equipment that were not based on valid prescriptions from licensed healthcare providers; (iii) Fee Schedule items that did not represent the HCPCS codes contained in the bills to GEICO; (iv) Non-Fee Schedule items at grossly inflated reimbursement rates; and (v) Fraudulent Equipment that were otherwise not reimbursable.

**B.     The Defendants' Illegal Financial Arrangements**

75.     Upon information and belief, in order to obtain access to Insureds so the Defendants could implement and execute their fraudulent schemes and maximize the amount of No-Fault Benefits the Supplier Defendants could obtain from GEICO and other New York automobile insurers, the Defendants and other healthcare providers – either directly or through third parties who are not presently identifiable – entered into illegal agreements where prescriptions for Fraudulent Equipment were provided to the Supplier Defendants in exchange for financial consideration.

76.     Upon information and belief, since at least 2015, the Supplier Defendants engaged in unlawful financial arrangements with the Referral Defendants and other healthcare providers – either directly or through third parties who are not presently identifiable – in order to obtain prescriptions for Fraudulent Equipment. These schemes allowed the Supplier Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

77.     In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the Supplier Defendants and healthcare

providers, including the Referral Defendants, Ayzenberg never met the healthcare providers who issued prescriptions that were provided to the Supplier Defendants.  Instead, the prescriptions for the Fraudulent Equipment were procured by Ayzenberg as a result of arrangements that were facilitated by third-parties associated with the healthcare providers at multi-disciplinary medical offices that catered to a high volume of no-fault insurance patients ("Clinics"), including the Referral Defendants.

78.     In further support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants – either directly or through third parties not presently identifiable – the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined treatment protocol.

79.     As explained in more detail below, the Supplier Defendants received prescriptions from various healthcare providers that practiced at Clinics across the New York metropolitan area containing one of two predetermined sets of virtually identical Fraudulent Equipment, which were not medically necessary.

80.     In many instances, healthcare providers, including the Referral Defendants, prescribed Insureds with both predetermined sets of Fraudulent Equipment.

81.     In also keeping with the fact that the Supplier Defendants obtained prescriptions for Fraudulent Equipment as a result of unlawful financial arrangements, the Supplier Defendants (i) would receive the two virtually identical predetermined sets of prescriptions from multiple healthcare providers operating out of the same Clinic, including – as set forth below – the Referral Defendants operating at the Richmond Ave Clinic; and (ii) obtain prescriptions for

Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

82.     Upon information and belief, and in keeping with the fact that the prescriptions for Fraudulent Equipment were obtained directly from the Clinics and without any involvement by the Insureds, the prescriptions issued by the Referral Defendants and other healthcare providers were provided directly to the Clinics' receptionists who then submitted the prescriptions directly to the Supplier Defendants.

83.     Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, in many cases, the Insureds were provided with Fraudulent Equipment directly from the Clinics' without any interaction with the Supplier Defendants.

84.     In further support that the Fraudulent Equipment was provided without any interaction by the Supplier Defendants, statements provided to GEICO by Insureds confirmed that when Insureds were actually provided with Fraudulent Equipment, they received it directly from one of the Clinics, typically from the receptionists, without any involvement from the Supplier Defendants, and never received prescriptions for Fraudulent Equipment from a healthcare provider.

85.     For example:

(i)     On November 28, 2015, an Insured named WJ was purportedly injured in a motor vehicle accident. Thereafter, WJ received treatment at a multi-disciplinary clinic located on Ralph Avenue in Brooklyn, New York. During an interview with a GEICO investigator, WJ confirmed that: (i) WJ received Fraudulent Equipment from the receptionist at the multi-disciplinary clinic located on Ralph Avenue in Brooklyn, New York; and (ii) WJ never received a prescription for the Fraudulent Equipment.

(ii)    On January 11, 2016, an Insured named WD was purportedly injured in a motor vehicle accident. Thereafter, WD received treatment at a multi-disciplinary clinic located on Ralph Avenue in Brooklyn, New York. During an interview with a GEICO investigator, WD confirmed that: (i) WD received Fraudulent Equipment from someone at the multi-

disciplinary clinic located on Ralph Avenue in Brooklyn, New York; and (ii) WD never received a prescription for the Fraudulent Equipment.

(iii)   On January 28, 2017, an Insured named AT was purportedly injured in a motor vehicle accident. Thereafter, AT received treatment at the Richmond Ave Clinic. During an interview with a GEICO investigator, AT confirmed that: (i) AT received Fraudulent Equipment from a receptionist at the Richmond Ave Clinic; (ii) the Fraudulent Equipment was provided in a garbage bag; and (iii) AT never received a prescription for the Fraudulent Equipment.

(iv)   On May 3, 2017, an Insured named JL was purportedly injured in a motor vehicle accident. Thereafter, JL received treatment at a multi-disciplinary clinic located on 65th Street in Brooklyn, New York. During an interview with a GEICO investigator, JL confirmed that: (i) JL received Fraudulent Equipment from the receptionist at the multi-disciplinary clinic located on 65th Street in Brooklyn, New York; (ii) JL received the Fraudulent Equipment in large bags; and (iii) the receptionist demonstrated to JL how to use the Fraudulent Equipment.

(v)   On January 2, 2018, an Insured named AV was purportedly injured in a motor vehicle accident. Thereafter, AV received treatment at the Richmond Ave Clinic. During an interview with a GEICO investigator, AV confirmed that: (i) AV received Fraudulent Equipment from a receptionist at the Richmond Ave Clinic; (ii) the Fraudulent Equipment was provided in a garbage bag; (iii) AV never received a prescription for the Fraudulent Equipment; and (iv) no one explained or demonstrated to AV how to use the Fraudulent Equipment.

86.   These are only representative examples. In virtually all the claims for Fraudulent Equipment identified in Exhibit "1", to the extent that the Insureds were actually provided with Fraudulent Equipment, the Insureds received the Fraudulent Equipment directly from the Clinics without any involvement from the Supplier Defendants.

87.   Upon information and belief, the Referral Defendants were knowingly involved in the Supplier Defendants unlawful financial arrangement schemes – either directly or through third-parties who are presently unidentifiable – by issuing prescriptions for Fraudulent Equipment that they knew were submitted to and billed by the Supplier Defendants as part of a scheme to defraud GEICO; or (ii) knowingly providing their license for others to issue

prescriptions for Fraudulent Equipment that they knew were submitted to and billed by the Supplier Defendants as part of a scheme to defraud GEICO.

88.     In keeping with the fact that the Referral Defendants were knowingly involved in the Supplier Defendants unlawful financial arrangement schemes, a frequent amount of the prescriptions for Fraudulent Equipment that were purportedly provided to the Supplier Defendants contained healthcare providers' signatures that were provided by signature stamps, including from Burt.

89.     Upon information and belief, Burt and other healthcare providers who had signature stamps knowingly provided their signature stamps to laypersons that would unlawfully issue prescriptions for Fraudulent Equipment that were directly provided to the Supplier Defendants.

90.     In all of the claims identified in Exhibits "1", the Supplier Defendants falsely represented that Fraudulent Equipment were provided pursuant to lawful prescriptions from healthcare providers, and where therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

### C.     The Defendants' Fraudulent Prescription-Issuing Protocol

91.     In addition to the unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants the prescriptions provided to the Supplier Defendants were issued pursuant to predetermined fraudulent protocols that were designed to maximize the billing that the Supplier Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

92.     In the claims identified in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

93.     Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referral Defendants and other healthcare providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

94.     In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidently, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

95.     To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

96.     However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the healthcare providers that referred patients to the Supplier Defendants – including the Referral Defendants – were subject to extremely similar treatment including nearly identical prescriptions for Fraudulent Equipment.

97.   The Referral Defendants and other healthcare providers issued prescriptions for Fraudulent Equipment to Insureds pursuant to predetermined fraudulent protocols without regard for the Insureds' individual symptoms or presentation.

98.   No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit the fraudulent protocols described below to proceed under his, her, or its auspices.

99.   The healthcare providers, including the Referral Defendants, permitted the predetermined fraudulent protocols described below, which were not medically necessary, to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other New York automobile insurers.

100.   Overall, the predetermined fraudulent protocols executed by the healthcare providers that purportedly treated Insureds, including the Referral Defendants, had a similar pattern for an overwhelming majority of the Insureds associated with the claims identified in Exhibit "1", and was typically as follows:

- the Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

- the Insured would be seen either by a physician, chiropractor, physician's assistant, or nurse practitioner;

- on the date of the first visit, the healthcare provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a predetermined set of DME and/or OD;

- subsequently, the Insured would return to the Clinic for one or more additional evaluations and would be provided with an additional, and occasionally more than one, prescription for a predetermined set of DME and/or OD;

- at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Supplier Defendants to fill and was without any involvement by the Insured.

101.    An overwhelming majority of the claims identified in Exhibit "1" are based upon medically unnecessary prescriptions for one of two predetermined sets of virtually identical Fraudulent Equipment, which were provided to the Supplier Defendants from various healthcare providers that practiced at Clinics across the New York metropolitan area.

102.    In keeping with the fact that the prescriptions provided to the Supplier Defendants were – not based on medical necessity but – part of a predetermined fraudulent protocol, an overwhelming majority of the Insureds identified in Exhibit "1" that were prescribed Fraudulent Equipment after purportedly undergoing initial examinations were issued prescriptions for virtually identical Fraudulent Equipment, regardless which healthcare provider and Clinic purportedly treated the Insureds.

103.    In keeping with the fact that the prescriptions were provided – not based on medical necessity but – as part of a predetermined fraudulent protocol, the prescriptions received by the Supplier Defendants after Insureds' purported initial examinations typically included the following Fraudulent Equipment: (i) a lower back brace; (ii) a cervical collar; (iii) a cervical pillow; (iv) a bed board; and (v) an egg crate mattress. These "initial examination prescriptions" were virtually identical regardless which healthcare provider, including the Referral Defendants, issued the prescription.

104.    Frequently, in addition to the typical "initial examination prescription", and as part of the predetermined fraudulent protocol, healthcare providers, including the Referral Defendants, would prescribe additional Fraudulent Equipment of virtually the same type, such as: (i) a knee orthotic; (ii) thermophore, *i.e.* an electric heating pad; and/or (iii) an "orthopedic car seat", i.e. a cushion to use while inside a vehicle.

105.     Similarly, and keeping with the fact that the prescriptions were provided to the Supplier Defendants – not based on medical necessity but – as part of a predetermined fraudulent protocol, an overwhelming majority of the Insureds identified in Exhibit "1" were prescribed virtually identical Fraudulent Equipment after purportedly undergoing follow-up examinations, regardless which healthcare provider and Clinic purportedly treated the Insureds.

106.     In keeping with the fact that the prescriptions were provided – not based on medical necessity but – as part of a predetermined fraudulent protocol, the prescriptions received by the Supplier Defendants after Insureds' purported follow-up examinations typically included the following Fraudulent Equipment: (i) an EMS unit; (ii) an EMS belt; (iii) a heat lamp; and a (iv) massager. These "follow-up examination prescriptions" were virtually identical regardless which healthcare provider, including the Referral Defendants, issued the prescription.

107.     Frequently, in addition to the typical "follow-up examination prescription", and as part of a predetermined fraudulent protocol, healthcare providers, including the Referral Defendants, would also prescribe – on a separate prescription – a whirlpool, i.e. a device that agitates the water in a bath.

108.     In further keeping with the fact that the prescriptions provided to the Supplier Defendants were – not based on medical necessity but – part of a predetermined fraudulent protocol, an overwhelming majority of the Insureds identified in Exhibit "1" would receive the typical "initial examination prescription" and/or the typical "follow-up examination prescription" regardless which healthcare provider issued the prescription.

109.     For the portion of the Insureds identified in Exhibit "1" who did not receive one of the two sets of predetermined prescriptions, virtually all of those Insureds were purportedly

provided with a whirlpool from the Supplier Defendants as those Insureds purportedly received additional DME and OD from another DME/OD retailer.

110.   Upon information and belief, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols – and not based upon medical necessity – the prescriptions issued by the Referral Defendants and the other healthcare providers were never given to the Insureds but were routed directly to the Supplier Defendants.

111.   Upon information and belief, in an overwhelming majority of cases, to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from receptionists at the healthcare providers' offices, without any interaction from the Supplier Defendants.

112.   In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

113.   Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider may – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

114.   In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or

OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

115. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

116. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

117. It is extremely improbable – to the point of impossibility – that an overwhelming majority of the Insureds identified in Exhibit "1" – who treated with one of many healthcare providers, including the Referral Defendants, at different Clinics around the New York metropolitan area – would ultimately receive at least one of two preset prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

118. A substantial number of Insureds receiving virtually identical prescriptions for multiple items of Fraudulent Equipment would, by extension, mean that all those Insureds – who reported to one of many healthcare providers across the New York metropolitan area – complained of identical symptoms and exhibited identical weaknesses in their physical conditions.

119. In actuality, the Insureds identified in Exhibit "1" who were provided with one of the two preset prescriptions of Fraudulent Equipment were provided with a specific preset prescription based solely upon whether the Insured visited the prescribing healthcare provider for an initial examination or a follow-up examination.

120.    In further keeping with the fact that the Referral Defendants and other healthcare providers prescribed Fraudulent Equipment purportedly provided by the Supplier Defendants pursuant to predetermined fraudulent protocols – and not based upon medical necessity – each healthcare provider who provided prescriptions to the Supplier Defendants issued virtually identical prescriptions for Fraudulent Equipment to virtually every patient, regardless whether those prescriptions were provided to the Supplier Defendants or another DME/OD retailer.

121.    It is also improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology as the result of the accident.

122.    It is extremely improbable that two or more Insureds involved in any single motor vehicle accident not only would suffer from substantially similar injuries and symptomatology but would need virtually the same specific items of DME and/or OD to aid in treating their individual symptoms.

123.    It is extremely improbable – to the point of impossibility – that this legitimately would occur over and over again, with two or more Insureds who were involved in the same accident repeatedly being prescribed virtually the same specific items of DME and/or OD to aid in treating their individual symptoms.

124.    If two or more Insureds who were involved in the same underlying motor vehicle accident received virtually identical prescriptions for Fraudulent Equipment then, by extension, all of the Insureds who were involved in the same underlying motor vehicle accident had virtually identical complaints and virtually identical symptoms.

125.    In keeping with the fact that the Referral Defendants and other healthcare providers prescribed predetermined sets of Fraudulent Equipment that were purportedly provided

by the Supplier Defendants pursuant to fraudulent protocols – and not based upon medical necessity – in virtually all cases when two or more Insureds were involved in the same accident the healthcare provider issued virtually identical prescriptions for Fraudulent Equipment.

126.    In further keeping with the fact that Fraudulent Equipment were prescribed pursuant to predetermined fraudulent protocols – and not based upon medical necessity – the specific Fraudulent Equipment contained on the prescriptions usually contravened the Insureds' conservative treatment plans.

127.    For example, and as indicated below, virtually every Insured identified in Exhibit "1" were provided with at least one prescription for Fraudulent Equipment that called for immobilizing devices, such as a lumbosacral brace (sometimes referred to as "lumbar orthotic" or "LSO") or thoracic-lumbosacral brace (sometimes referred to as "TLSO") and a cervical collar. By contrast, the Insureds were also prescribed physical therapy treatments which called for the bending and stretching to strengthen weakened parts of the body.

128.    The purportedly prescribed immobilizing devices completely contravene the mobilizing physical therapy treatments that the Insureds were also prescribed. In the context of treatment for injuries related to minor and low-impact motor vehicle accidents, no legitimate physician, chiropractor, or other licensed healthcare provider acting in each patient's best interest would prescribe both mobilizing physical therapy and immobilizing devices at the same time.

129.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols, and not for the benefit of the Insureds – as set forth below – the prescriptions were purposefully generic and vague so as to allow the Supplier Defendants to choose the specific type of Fraudulent Equipment that they billed GEICO and other New York automobile insurers, in order to increase their financial gain.

1)      **The Predetermined Fraudulent Protocol at the Richmond Avenue Clinic**

130.    Apple and Burt, either directly or with the assistance of third-party individuals not presently known, agreed to participate in a predetermined fraudulent protocol and unlawful financial arrangement, with the Supplier Defendants where they provided the Insureds that treated at the Richmond Ave Clinic with prescriptions for a predetermined set of Fraudulent Equipment.

131.    Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who purportedly received treatment at the Richmond Ave Clinic were purportedly provided with initial examinations from a healthcare provider, including Apple or Burt. Subsequent to their purported initial examinations, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

132.    When the Insureds sought treatment with and were purportedly provided with an initial evaluation by a healthcare provider at the Richmond Avenue Clinic, including Apple and Burt, the healthcare providers did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

133.    Rather, each healthcare provider at the Richmond Ave Clinic, including Apple and Burt, prescribed a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon the fraudulent protocol established with the Supplier Defendants.

134.    In keeping with the fact that the prescriptions issued by healthcare providers at the Richmond Ave Clinic, including Apple and Burt, subsequent to purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination at the Richmond Ave

Clinic – regardless which healthcare provider – received a prescription for virtually the same type of Fraudulent Equipment.

135.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination, every healthcare provider at the Richmond Ave Clinic, including Apple and Burt, virtually always prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that they treated: (i) cervical collar, two-piece; (ii) L.S.O. support; (iii) bed board: (iv) egg crate mattress; and (v) cervical pillow.

136.    In addition to the five items prescribed after a purported initial examination, healthcare providers at the Richmond Ave Clinic, including Apple and Burt, would occasionally include an "orthopedic car seat" or lumbar cushion to the prescription for Fraudulent Equipment.

137.    For example:

(i)     On August 27, 2017, a patient named CS was purportedly involved in a motor vehicle accident. CS purportedly started treating at the Richmond Ave Clinic on or around September 13, 2017. After Apple purportedly performed an initial examination on CS, Apple issued a prescription in the name of CS that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a lumbar support brace; (iii) a bed board; (iv) an egg crate mattress; and (v) a cervical pillow.

(ii)    On October 31, 2017, a patient named NZ was purportedly involved in a motor vehicle accident. NZ purportedly started treating at the Richmond Ave Clinic on or around November 8, 2017. After Apple purportedly performed an initial examination on NZ, Apple issued a prescription in the name of NZ that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a lumbar support brace; (iii) a bed board; (iv) an egg crate mattress; and (v) a cervical pillow.

(iii)   On April 10, 2018, a patient named KZ was purportedly involved in a motor vehicle accident. KZ purportedly started treating at the Richmond

Ave Clinic on or around April 18, 2018. After Apple purportedly performed an initial examination on KZ, Apple issued a prescription in the name of KZ that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a lumbar support brace; (iii) a bed board; (iv) an egg crate mattress; and (v) a cervical pillow.

(iv)    On September 20, 2018, a patient named FM was purportedly involved in a motor vehicle accident. FM purportedly started treating at the Richmond Ave Clinic on or around September 28, 2018. After Burt purportedly performed an initial examination on FM, Burt issued a prescription in the name of FM that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a lumbar support brace; (iii) a bed board; (iv) an egg crate mattress; and (v) a cervical pillow.

(v)    On October 2, 2018, a patient named YJ was purportedly involved in a motor vehicle accident. YJ purportedly started treating at the Richmond Ave Clinic on or around September 28, 2018. After Burt purportedly performed an initial examination on YJ, Burt issued a prescription in the name of YJ that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a lumbar support brace; (iii) a bed board; (iv) an egg crate mattress; and (v) a cervical pillow.

138.    These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received treatment at the Richmond Ave Clinic purportedly received an initial examination by a healthcare provider, including Apple and/or Burt, and were then provided with virtually identical prescripts for the following Fraudulent Equipment: (i) a lumbar support brace; (ii) a two-piece cervical collar; (iii) a bed board; (iv) an egg crate mattress; and (v) an cervical pillow.

139.    In keeping with the fact that the prescriptions issued at the Richmond Ave Clinic after purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, the healthcare providers' initial examination reports, which were purportedly written on the same date as the prescription for Fraudulent Equipment, did not appropriately describe the prescribed Fraudulent Equipment.

140.    In a legitimate setting, when a patient is prescribed DME and/or OD by a healthcare provider, the healthcare provider would indicate in a contemporaneous evaluation report what specific DME and/or OD was prescribed and why.  Such information is typically included in a contemporaneous report so the healthcare provider can recall what he or she previously prescribed and provide proper follow-up questions during a subsequent evaluation.

141.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided after purported initial examinations at the Richmond Ave Clinic were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the contemporaneous initial examination reports did not contain any sufficient information to explain why the healthcare providers prescribed any of the Fraudulent Equipment.

142.    In many circumstances, the contemporaneous evaluation reports did not sufficiently identify the Fraudulent Equipment prescribed to the Insureds.

143.    For example, in Apple's checklist and fill-in the blank evaluation reports, the reports that were generated contemporaneous with the purported prescriptions for Fraudulent Equipment only stated "durable medical equipment" in the recommendation section. Apple's evaluation reports did not indicate what equipment was to be provided or an explanation for prescribing any of the Fraudulent Equipment.

144.    Similarly, Burt's electronic evaluations reports that were generated contemporaneous with the prescriptions for Fraudulent Equipment would briefly indicate "DME" and identify – in vague terms – lumbar brace and cervical collar or lumbar support and cervical support, not any of the other Fraudulent Equipment prescribed. None of Burt's evaluation reports contained any specific detail regarding what Fraudulent Equipment was to be prescribed or why the Fraudulent Equipment was prescribed.

145.     The predetermined fraudulent protocol between the Supplier Defendants and the healthcare providers at the Richmond Ave Clinic, including Apple and Burt, continued after the Insureds' initial examinations. To the extent that the Insureds identified in Exhibit "1" returned to the Richmond Ave Clinic and purportedly underwent follow-up examinations, the Insureds would virtually always be provided with prescriptions for another – virtually identical – set of Fraudulent Equipment.

146.     In keeping with the fact that the prescriptions provided to the Insureds subsequent to purported follow-up examinations at the Richmond Ave Clinic were medically unnecessary and provided pursuant to a predetermined fraudulent protocol with the Supplier Defendants, virtually every Insured received at least one prescription for virtually the same type of Fraudulent Equipment regardless which healthcare provider issued the prescription.

147.     Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, after a purported follow-up examination, every healthcare provider at the Richmond Ave Clinic, including Apple and Burt, virtually always prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that they treated: (i) a massager; (ii) infrared heat lamp; (iii) EMS unit: and (iv) EMS belt.

148.     In addition to the four items prescribed after a purported follow-up examination, healthcare providers at the Richmond Ave Clinic, including Apple and Burt, would frequently provide a separate prescription for a whirlpool.

149.     When the Insureds identified in Exhibit "1" were prescribed Fraudulent Equipment after a purported follow-up examination, the healthcare providers at the Richmond

Ave Clinic would issue two separate prescriptions on a single date that would be provided to the Supplier Defendants.

150.    In addition, and in keeping with the fact that the prescriptions provided to the Insureds identified in Exhibit "1" were not medically necessary and part of a predetermined fraudulent protocol, the Insureds were virtually always issued two additional prescriptions for DME and/or OD that were provided to another DME/OD retailer.

151.    In total, a frequent amount of the Insureds identified in Exhibit "1" that received follow-up examinations at the Richmond Ave Clinic were issued four prescriptions for DME and/or OD on the same date as a purported follow-up examination, with two prescriptions provided to the Supplier Defendants and the other two prescriptions were provided to a single DME/OD retailer.

152.    Upon information and belief, the healthcare providers at the Richmond Ave Clinic, including Apple and Burt, virtually always issued multiple separate prescriptions on a single date for an individual Insured in order to provide the Supplier Defendants – and other DME/OD retailers – with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to avoid detection of their fraudulent schemes.

153.    In keeping with the fact that the healthcare providers at the Richmond Ave Clinic issued multiple prescriptions to Insureds on a single date to further their fraudulent scheme, the multiple prescriptions for Fraudulent Equipment could have easily been provided on one single prescription, or – at a minimum – one prescription per DME/OD retailer.

154.    There is no legitimate reason why any healthcare provider would need to issue multiple prescriptions to an individual Insured on a single date that was filled by a single DME/OD retailer, including the Supplier Defendants. Even more, there is no legitimate reason

why this would occur in a substantial amount of the Insureds identified in Exhibit "1" who treated at the Richmond Ave Clinic.

155.    However, the healthcare providers at the Richmond Ave Clinic frequently issued four separate prescriptions for DME and/or OD to an Insured after the Insured's purported follow-up examination. For example:

(i)     On August 27, 2017, a patient named CS was purportedly involved in a motor vehicle accident. CS purportedly returned to the Richmond Ave Clinic for a follow-up examination with Apple on November 21, 2017. On that date, Apple issued the following prescriptions in the name of CS: (i) a prescription for a massager, infra-red lamp, EMS unit, and EMS belt that was provided to the Supplier Defendants: (ii) a prescription for a whirlpool that was provided to the Supplier Defendants; (iii) a prescription for a cervical traction unit that was provided to Goldstar Equipment, Inc.("Goldstar"); and (iv) a prescription for a lumbar sacral orthotic that was provided to Goldstar.

(ii)    On October 31, 2017, a patient named NZ was purportedly involved in a motor vehicle accident. NZ purportedly returned to the Richmond Ave Clinic for a follow-up examination with Apple on December 27, 2017. On that date, Apple issued the following prescriptions in the name of NZ: (i) a prescription for a massager, infra-red lamp, EMS unit, and EMS belt that was provided to the Supplier Defendants: (ii) a prescription for a whirlpool that was provided to the Supplier Defendants; (iii) a prescription for a cervical traction unit that was provided to Goldstar; and (iv) a prescription for a lumbar sacral orthotic that was provided to Goldstar.

(iii)   On May 13, 2018, a patient named CS was purportedly involved in a motor vehicle accident. CS purportedly returned to the Richmond Ave Clinic for a follow-up examination with Apple on June 20, 2018. On that date, Apple issued the following prescriptions in the name of CS: (i) a prescription for a massager, infra-red lamp, EMS unit, and EMS belt that was provided to the Supplier Defendants: (ii) a prescription for a whirlpool that was provided to the Supplier Defendants; (iii) a prescription for a cervical traction unit that was provided to Goldstar; and (iv) a prescription for a lumbar sacral orthotic that was provided to Goldstar.

(iv)    On September 20, 2018, a patient named FM was purportedly involved in a motor vehicle accident. FM purportedly returned to the Richmond Ave Clinic for a follow-up examination with Burt on November 6, 2018. On that date, Burt issued the following prescriptions in the name of FM: (i) a prescription for a massager, infra-red lamp, EMS unit, and EMS belt that

was provided to the Supplier Defendants: (ii) a prescription for a whirlpool that was provided to the Supplier Defendants; (iii) a prescription for a cervical traction unit that was provided to Goldstar; and (iv) a prescription for a lumbar sacral orthotic that was provided to Goldstar.

(v) On October 3, 2018, a patient named JG was purportedly involved in a motor vehicle accident. JG purportedly returned to the Richmond Ave Clinic for a follow-up examination with Burt on November 13, 2018. On that date, Burt issued the following prescriptions in the name of JG: (i) a prescription for a massager, infra-red lamp, EMS unit, and EMS belt that was provided to the Supplier Defendants: (ii) a prescription for a whirlpool that was provided to the Supplier Defendants; (iii) a prescription for a cervical traction unit that was provided to Goldstar; and (iv) a prescription for a lumbar sacral orthotic that was provided to Goldstar.

156. These are only representative samples. In fact, a frequent amount of the Insureds identified in Exhibit "1" that received purported follow-up examinations at the Richmond Ave Clinic were issued four prescriptions for DME and/or OD, including two prescriptions that were provided to the Supplier Defendants, and two prescriptions that were provided to another DME/OD retailer.

157. Similar to the prescriptions issued after purported initial examination, and in keeping with the fact that the prescriptions provided after purported follow-up examinations at the Richmond Ave Clinic were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the contemporaneous follow-up examination reports did not contain any sufficient information to explain why the healthcare providers prescribed any of the Fraudulent Equipment.

158. Furthermore, and in keeping with the fact that the prescriptions provided after purported follow-up examinations at the Richmond Ave Clinic were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

159.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

160.    However, the follow-up examination reports from healthcare providers at the Richmond Ave Clinic failed to include any meaningful information – let alone any information – regarding Fraudulent Equipment prescribed to the Insureds on a prior date.

161.    In keeping with the fact that all the prescriptions issued to the Insureds identified in Exhibit "1" by the healthcare providers at the Richmond Ave Clinic were not medically necessary and were part of a predetermined fraudulent protocol, when two or more Insureds were involved in the same underlying motor vehicle accident and received treatment at the Richmond Ave Clinic, those Insureds virtually always received the above-described virtually identical prescriptions for Fraudulent Equipment.

162.    For example:

> (i)    On July 17, 2017, two Insureds – AS and FS – were involved in the same automobile accident. Thereafter, AS and FS both received treatment at the Richmond Ave Clinic. AS and FS were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations of AS and FS by Bret Edelman, MD ("Edelman") – at the direction of Apple – Edelman issued virtually identical prescriptions for Fraudulent Equipment to AS and FS that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a lumbar support brace; (iii) a bed board; (iv) an egg crate mattress; and (v) a cervical pillow. Furthermore, subsequent to purported follow-up examinations of AS and FS by Edelman – at the direction of Apple – Edelman issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which

included: (i) a prescription for a massager, infra-red lamp, EMS unit, and EMS belt; and (ii) a separate prescription for a whirlpool.

(ii)    On January 12, 2018, two Insureds – TB and ID – were involved in the same automobile accident. Thereafter, TB and ID both received treatment at the Richmond Ave Clinic. TB and ID were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Apple's purported initial examinations of TB and ID, Apple issued virtually identical prescriptions for Fraudulent Equipment to TB and ID that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a lumbar support brace; (iii) a bed board; (iv) an egg crate mattress; and (v) a cervical pillow. Furthermore, subsequent to Apple's purported follow-up examinations of TB and ID, Apple issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which included: (i) a prescription for a massager, infra-red lamp, EMS unit, and EMS belt; and (ii) a separate prescription for a whirlpool.

(iii)    On April 6, 2018, two Insureds – JS and JS – were involved in the same automobile accident. Thereafter, JS and JS both received treatment at the Richmond Ave Clinic. JS and JS were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations of JS and JS by Yahya Shah, PA ("Shah") – at the direction of Apple – Shah issued virtually identical prescriptions for Fraudulent Equipment to JS and JS that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a lumbar support brace; (iii) a bed board; (iv) an egg crate mattress; and (v) a cervical pillow. Furthermore, subsequent to Apple's purported follow-up examinations of JS and JS, Apple issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which included: (i) a prescription for a massager, infra-red lamp, EMS unit, and EMS belt; and (ii) a separate prescription for a whirlpool.

(iv)    On April 12, 2018, three Insureds – AD, CD, and FD – were involved in the same automobile accident. Thereafter, AD, CD, and FD all received treatment at the Richmond Ave Clinic. AD, CD, and FD were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Apple's purported initial examinations of AD, CD, and FD, Apple issued virtually identical prescriptions for Fraudulent Equipment to AD, CD, and FD that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a lumbar support brace; (iii) a bed board; (iv) an egg crate mattress; and (v) a cervical pillow. Furthermore, subsequent to

Apple's purported follow-up examinations of AD, CD, and FD, Apple issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which included: (i) a massager; (ii) infra-red lamp; (iii) EMS unit; and (iv) EMS belt.

(v)     On October 23, 2018, three Insureds – DJ, KJ, and HW – were involved in the same automobile accident. Thereafter, DJ, KJ, and HW all received treatment at the Richmond Ave Clinic. DJ, KJ, and HW were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Burt's purported initial examinations of DJ, KJ, and HW, Burt issued virtually identical prescriptions for Fraudulent Equipment to DJ, KJ, and HW that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a lumbar support brace; (iii) a bed board; (iv) an egg crate mattress; and (v) a cervical pillow. Furthermore, subsequent to Burt's purported follow-up examinations of DJ, KJ, and HW, Burt issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which included: (i) a prescription for a massager, infra-red lamp, EMS unit, and EMS belt; and (ii) a separate prescription for a whirlpool.

163.    These are only representative examples. In virtually all of the claims for Fraudulent Equipment identified in Exhibit "1" where two or more Insureds were involved in the same underlying accident and received treatment at the Richmond Ave Clinic, the healthcare providers at the Richmond Ave Clinic, including Apple and Burt, virtually always prescribed multiple prescriptions for virtually identical Fraudulent Equipment despite the fact that the Insureds were differently situated.

164.    In addition to the above, and in keeping with the fact that each prescription for Fraudulent Equipment issued from a healthcare provider at the Richmond Ave Clinic was pursuant to a predetermined fraudulent protocol as a result of an unlawful financial arrangement with the Supplier Defendants, it is notable that: (i) virtually all of the prescriptions issued to the Insureds who treated at the Richmond Ave Clinic were for the Fraudulent Equipment identified as part of the pattern above, regardless which healthcare provider issued the prescriptions; (ii) in many circumstances GEICO received prescriptions that appear to be signed using a signature

stamp or photocopied form; and (iii) in many circumstances GEICO received prescriptions for Fraudulent Equipment with a specific date when GEICO did not receive a bill for services provided by the prescribing healthcare provider on or around the date of the prescription.

165.    In further keeping with the fact that each prescription for Fraudulent Equipment issued from a healthcare provider at the Richmond Ave Clinic was not medically necessary and was part of the fraudulent scheme, virtually all of the prescriptions for cervical collars and lumbar support braces routinely contravened the Insureds' conservative treatment plans.  For example, Apple and Burt systemically prescribed cervical collars and lumbar support braces which immobilize the patient while directing the Insureds to undergo physical therapy regimens, which would require prolonged bending and stretching of weakened parts of the body, including the spine. In this context, the prescriptions for cervical collars and lumbar support braces completely contravened the mobilizing physical therapy treatments also prescribed by the same healthcare provider. No legitimate treatment regimen would involve the simultaneous prescription of mobilizing physical therapy and immobilizing devices.

166.    Additionally, as part of the fraudulent scheme, the prescriptions issued by the healthcare providers at the Richmond Ave Clinic, including Apple and Burt, were never given to the Insureds but were routed directly to the Supplier Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Richmond Ave Clinic, without any interaction with or instruction concerning their use from either the Supplier Defendants or a healthcare provider.

167.    Additionally as part of the fraudulent scheme, the prescriptions issued by the healthcare providers at the Richmond Ave Clinic, including Apple and Burt, were purposefully

generic and vague so as to allow the Supplier Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

168.     By way of example, rather than specifying the type of lumbar orthotic devices that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code – Apple and Burt simply issued prescriptions containing the phrase "LSO support" with the intent of enabling the Supplier Defendants to select a specific type of lumbar brace that was more highly priced and profitable, instead of issuing prescriptions for lumbar braces that were actually needed in the first instance.

### 2)     The Predetermined Fraudulent Protocol Involving Stracar

169.     Similar to the scheme at the Richmond Ave Clinic, Stracar, either directly or through the aid of third-party individuals who are not presently known, agreed to participate in a predetermined fraudulent protocol, as a result of an unlawful financial arrangement, with the Supplier Defendants where he provided the Insureds that treated at the Eastchester Road Clinic with prescriptions for a predetermined set of Fraudulent Equipment.

170.     Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who treated with Stracar were purportedly provided with initial examinations. After the initial examinations, each of the Insureds were prescribed a preset prescription for multiple items of Fraudulent Equipment.

171.     When the Insureds sought treatment with and were purportedly evaluated by Stracar, Stracar did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

172.    Rather, Stracar prescribed a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon the fraudulent protocol established with the Supplier Defendants.

173.    In keeping with the fact that the prescriptions issued by Stracar subsequent to purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination by Stracar received a prescription for virtually the same type of Fraudulent Equipment.

174.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination, Stracar virtually always prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that he treated: (i) cervical collar, two-piece; (ii) T.L.S.O. support; (iii) bed board: (iv) egg crate mattress; (v) cervical pillow; and (vi) thermophore.

175.    In addition to the six items described above, Stracar would regularly prescribe an orthopedic car seat cushion, and occasionally prescribe a knee support brace.

176.    For example:

(i)     On October 12, 2017, a patient named NA was purportedly involved in a motor vehicle accident. NA purportedly started treating with Stracar on October 17, 2017. After Stracar purportedly performed an initial examination on NA, Stracar issued a prescription in the name of NA that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a TLSO support brace; (iii) a bed board; (iv) an egg crate mattress; (v) a cervical pillow; (vi) a thermophore; and (vii) a left knee support.

(ii)    On December 17, 2017, a patient named MS was purportedly involved in a motor vehicle accident. MS purportedly started treating with Stracar on December 20, 2017. After Stracar purportedly performed an initial examination on MS, Stracar issued a prescription in the name of MS that was provided to the Supplier Defendants for the following Fraudulent

Equipment: (i) a two-piece cervical collar; (ii) a TLSO support brace; (iii) a bed board; (iv) an egg crate mattress; (v) a cervical pillow; (vi) a thermophore; and (vii) an orthopedic car seat cushion.

(iii)    On February 16, 2018, a patient named LS was purportedly involved in a motor vehicle accident. LS purportedly started treating with Stracar on February 19, 2018. After Stracar purportedly performed an initial examination on LS, Stracar issued a prescription in the name of LS that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a TLSO support brace; (iii) a bed board; (iv) an egg crate mattress; (v) a cervical pillow; (vi) a thermophore; and (vii) an orthopedic car seat cushion.

(iv)    On October 26, 2018, a patient named JC was purportedly involved in a motor vehicle accident. JC purportedly started treating with Stracar on October 29, 2018. After Stracar purportedly performed an initial examination on JC, Stracar issued a prescription in the name of JC that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a TLSO support brace; (iii) a bed board; (iv) an egg crate mattress; (v) a cervical pillow; (vi) a thermophore; and (vii) an orthopedic car seat cushion.

(v)    On January 29, 2019, a patient named FS was purportedly involved in a motor vehicle accident. FS purportedly started treating with Stracar on February 1, 2019. After Stracar purportedly performed an initial examination on FS, Stracar issued a prescription in the name of FS that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a TLSO support brace; (iii) a bed board; (iv) an egg crate mattress; (v) a cervical pillow; (vi) a thermophore; and (vii) an orthopedic car seat cushion.

177.    These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received an initial examination by Stracar were provided with a preset prescriptions containing the following Fraudulent Equipment: (i) a TLSO support brace; (ii) a two-piece cervical collar; (iii) a bed board; (iv) an egg crate mattress; (v) an cervical pillow; and (vi) a thermophore.

178.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided after purported initial examinations by Stracar were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the contemporaneous initial examination reports

did not contain any sufficient information to explain why the healthcare providers prescribed any of the Fraudulent Equipment.

179.    The predetermined fraudulent protocol between the Supplier Defendants and Stracar continued after the Insureds' initial examinations. To the extent that the Insureds identified in Exhibit "1" continued treating with Stracar and purportedly underwent follow-up examinations, the Insureds would virtually always be provided with two additional prescriptions for virtually identical Fraudulent Equipment, one at each of the first two follow-up examinations.

180.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, after the first purported follow-up examination, Stracar virtually always prescribed to every Insured identified in Exhibit "1" that he treated with a whirlpool.

181.    Thereafter at a second follow-up examination, and again regardless of the type of motor vehicle accident, age of each patient, each patient's physical condition, each patient's subjective complaints, or each patient's actual recovery, Stracar virtually always prescribed another preset prescription for Fraudulent Equipment, which included: (i) a massager; (ii) infrared heat lamp; (iii) EMS unit: and (iv) EMS belt.

182.    For example:

(i)     On April 17, 2017, a patient named SH was purportedly involved in a motor vehicle accident. SH purportedly started treating with Stracar on April 19, 2017. Following a purported follow-up examination on May 3, 2017, Stracar issued a prescription in the name of SH for a whirlpool that was provided to the Supplier Defendants. After another purported follow-up examination on June 7, 2017, Stracar issued a prescription in the name of SH for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) massager; (ii) infra-red lamp; (iii) EMS unit; and (iv) EMS belt.

(ii)     On September 1, 2017, a patient named FG was purportedly involved in a motor vehicle accident. FG purportedly started treating with Stracar on September 12, 2017. Following a purported follow-up examination on October 3, 2017, Stracar issued a prescription in the name of FG for a whirlpool that was provided to the Supplier Defendants. After another purported follow-up examination on November 8, 2017, Stracar issued a prescription in the name of FG for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) massager; (ii) infra-red lamp; (iii) EMS unit; and (iv) EMS belt.

(iii)    On January 17, 2018, a patient named DM was purportedly involved in a motor vehicle accident. DM purportedly started treating with Stracar on January 19, 2018. Following a purported follow-up examination on March 6, 2018, Stracar issued a prescription in the name of DM for a whirlpool that was provided to the Supplier Defendants. After another purported follow-up examination on March 23, 2018, Stracar issued a prescription in the name of DM for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) massager; (ii) infra-red lamp; (iii) EMS unit; and (iv) EMS belt.

(iv)    On March 31, 2018, a patient named GI was purportedly involved in a motor vehicle accident. GI purportedly started treating with Stracar on April 12, 2018. Following a purported follow-up examination on May 1, 2018, Stracar issued a prescription in the name of GI for a whirlpool that was provided to the Supplier Defendants. After another purported follow-up examination on June 18, 2018, Stracar issued a prescription in the name of GI for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) massager; (ii) infra-red lamp; (iii) EMS unit; and (iv) EMS belt.

(v)     On September 8, 2018, a patient named BD was purportedly involved in a motor vehicle accident. BD purportedly started treating with Stracar on September 21, 2018. Following a purported follow-up examination on October 8, 2018, Stracar issued a prescription in the name of BD for a whirlpool that was provided to the Supplier Defendants. After another purported follow-up examination on November 13, 2018, Stracar issued a prescription in the name of BD for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) massager; (ii) infra-red lamp; (iii) EMS unit; and (iv) EMS belt.

183.    These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received two follow-up examinations by Stracar were issued a

prescription for a whirlpool and a second preset prescription for multiple items of Fraudulent Equipment, including a massager, infra-red lamp, EMS unit, and EMS belt.

184.    Similar to the prescriptions issued after purported initial examination, and in keeping with the fact that the prescriptions provided by Stracar after purported follow-up examinations were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the contemporaneous follow-up examination reports did not contain any sufficient information to explain why Stracar prescribed any of the Fraudulent Equipment.

185.    In keeping with the fact that the prescriptions provided by Stracar after purported follow-up examinations were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

186.    Furthermore, and in keeping with the fact that all the prescriptions by Stracar issued to the Insureds identified in Exhibit "1" were not medically necessary and were part of a predetermined fraudulent protocol, when two or more Insureds were involved in the same underlying motor vehicle accident and received treatment at the Eastchester Road Clinic, those Insureds virtually always received the above-described virtually identical prescriptions for Fraudulent Equipment.

187.    For example:

(i)     On April 17, 2017, two Insureds – SH and CQ – were involved in the same automobile accident. Thereafter, both SH and CQ sought treatment with Stracar. SH and CQ were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Stracar's purported initial examinations of SH and CQ, Stracar issued virtually identical preset prescriptions for Fraudulent Equipment to SH and CQ that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a TLSO support brace; (iii) a bed board; (iv) an egg crate mattress; (v) a cervical pillow; (vi) a thermophore; and (vii) a knee support. Subsequent to Stracar's purported

follow-up examinations of SH and CQ, Stracar issued virtually identical prescriptions for whirlpools that were provided to the Supplier Defendants. Furthermore, after Stracar's purported second follow-up examinations of SH and CQ, Stracar issued virtually identical preset prescriptions for the following Fraudulent Equipment that were provided to the Supplier Defendants: (i) a massager; (ii) a heat lamp; (iii) an EMS unit; and (iv) an EMS belt.

(ii)     On January 26, 2018, two Insureds – MN and TM – were involved in the same automobile accident. Thereafter, both MN and TM sought treatment with Stracar. MN and TM were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Stracar's purported initial examinations of MN and TM, Stracar issued virtually identical preset prescriptions for Fraudulent Equipment to MN and TM that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a TLSO support brace; (iii) a bed board; (iv) an egg crate mattress; (v) a cervical pillow; and (vi) a thermophore. Subsequent to Stracar's purported follow-up examinations of MN and TM, Stracar issued virtually identical prescriptions for whirlpools that were provided to the Supplier Defendants. Furthermore, after Stracar's purported second follow-up examinations of MN and TM, Stracar issued virtually identical preset prescriptions for the following Fraudulent Equipment that were provided to the Supplier Defendants: (i) a massager; (ii) a heat lamp; (iii) an EMS unit; and (iv) an EMS belt.

(iii)    On February 27, 2018, two Insureds – DF and MH – were involved in the same automobile accident. Thereafter, both DF and MH sought treatment with Stracar. DF and MH were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Stracar's purported initial examinations of DF and MH, Stracar issued virtually identical preset prescriptions for Fraudulent Equipment to DF and MH that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a TLSO support brace; (iii) a bed board; (iv) an egg crate mattress; (v) a cervical pillow; and (vi) a thermophore. Subsequent to Stracar's purported follow-up examinations of DF and MH, Stracar issued virtually identical prescriptions for whirlpools that were provided to the Supplier Defendants. Furthermore, after Stracar's purported second follow-up examinations of DF and MH, Stracar issued virtually identical preset prescriptions for the following Fraudulent Equipment that were provided to the Supplier Defendants: (i) a massager; (ii) a heat lamp; (iii) an EMS unit; and (iv) an EMS belt.

(iv)    On March 20, 2018, two Insureds – EC and VC – were involved in the same automobile accident. Thereafter, both EC and VC sought treatment with Stracar. EC and VC were different ages, in different physical conditions,

and experienced the impact from different positions in the vehicle. Even so, subsequent to Stracar's purported initial examinations of EC and VC, Stracar issued virtually identical preset prescriptions for Fraudulent Equipment to EC and VC that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a TLSO support brace; (iii) a bed board; (iv) an egg crate mattress; (v) a cervical pillow; (vi) a thermophore; (vii) a orthopedic seat cushion; and (viii) a knee support. Subsequent to Stracar's purported follow-up examinations of EC and VC, Stracar issued virtually identical prescriptions for whirlpools that were provided to the Supplier Defendants. Furthermore, after Stracar's purported second follow-up examinations of EC and VC, Stracar issued virtually identical preset prescriptions for the following Fraudulent Equipment that were provided to the Supplier Defendants: (i) a massager; (ii) a heat lamp; (iii) an EMS unit; and (iv) an EMS belt.

(v)     On February 1, 2019, two Insureds – JE and VC – were involved in the same automobile accident. Thereafter, both JE and VC sought treatment with Stracar. JE and VC were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Stracar's purported initial examinations of JE and VC, Stracar issued virtually identical preset prescriptions for Fraudulent Equipment to JE and VC that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a TLSO support brace; (iii) a bed board; (iv) an egg crate mattress; (v) a cervical pillow; and (vi) a thermophore. Furthermore, subsequent to Stracar's purported follow-up examinations of JE and VC, Stracar issued virtually identical prescriptions for whirlpools that were provided to the Supplier Defendants.

188.    These are only representative examples. In virtually all of the claims for Fraudulent Equipment identified in Exhibit "1" where two or more Insureds were involved in the same underlying accident were treated by Stracar, Stracar virtually always prescribed multiple prescriptions for virtually identical Fraudulent Equipment despite the fact that the Insureds were differently situated.

189.    In further keeping with the fact that each prescription for Fraudulent Equipment issued from a healthcare provider at the Eastchester Road Clinic was not medically necessary and was part of the fraudulent scheme, virtually all of the prescriptions for cervical collars and back support braces routinely contravened the Insureds' conservative treatment plans. For

example, Stracar systemically prescribed cervical collars and back support braces, and occasionally knee support braces, which immobilize the patient while directing the Insureds to undergo physical therapy regimens, which would require prolonged bending and stretching of weakened parts of the body, including the spine. In this context, the prescriptions for cervical collars, back support braces, and knee support braces completely contravened the mobilizing physical therapy treatments also prescribed by the same healthcare provider. No legitimate treatment regimen would involve the simultaneous prescription of mobilizing physical therapy and immobilizing devices.

190.    Additionally, as part of the fraudulent scheme, the prescriptions issued by Stracar were never given to the Insureds but were routed directly to the Supplier Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Eastchester Road Clinic, without any interaction with or instruction concerning their use from either the Supplier Defendants or a healthcare provider.

191.    Additionally as part of the fraudulent scheme, the prescriptions issued by Stracar were purposefully generic and vague so as to allow the Supplier Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

192.    By way of example, rather than specifying the type of back support brace and knee support braces that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code – Stracar simply issued prescriptions containing the phrase "TLSO" and "knee support" with the intent of

enabling the Supplier Defendants to select a specific type of support brace that was more highly priced and profitable, instead of issuing prescriptions for support braces that were actually needed in the first instance.

> **D.     The Unlawful Distribution of Fraudulent Equipment to Insureds by the Supplier Defendants Without Valid Prescriptions**

193.    Med Equipments is not a licensed medical professional corporation, and Ayzenberg is not a licensed healthcare provider. As such, the Supplier Defendants were not lawfully permitted to prescribe DME and OD to Insureds. For the same reason, the Supplier Defendants cannot properly dispense DME and/or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies the DME and/or OD to be provided.

194.    However, in many of the fraudulent claims identified in Exhibit "1", the Supplier Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider. More specifically, the prescriptions for DME and/or OD provided to the Supplier Defendants from the Referral Defendants and other healthcare providers were vague and generic because the prescriptions did not definitively identify the DME and/or OD to be provided. For example, the vague and generic prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Supplier Defendants to a unique type of DME and/or OD.

195.    The vague and generic prescriptions from the Referral Defendants – and other healthcare providers – was intended to and actually provided the Supplier Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

196.    The Referral Defendants – and other healthcare providers – intended to issue vague and generic prescriptions to and actually provided the Supplier Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

197.    In a legitimate clinical setting, a DME/OD retailer would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements in order to dispense the appropriate DME and/or OD prescribed to each patient. Upon information and belief, the Supplier Defendants never contacted the referring healthcare provider to seek instruction and/or clarification, but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, the Supplier Defendants elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate in the higher-end of the permissible range under the Medicaid Fee Schedule.

198.    For example, the prescriptions issued by the healthcare providers at the Richmond Ave Clinic, including Apple and Burt, requested a "l.s.o. support" corresponded to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds, including:

(i)     HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

(ii)    HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii)   HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v)    HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)    HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $ 806.64.

(viii)    HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $ 1150.00.

(ix)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)    HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)    HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)    HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xiii)    HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)    HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xv)    HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)   HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)   HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii)   HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)   HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx)   HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)   HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)   HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii)   HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

199.   Similarly, the prescriptions issued by Stracar that requested a "TLSO" corresponded to over 20 unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds, including:

(i)   HCPCS Code L0450, a TLSO that provides trunk support in the upper thoracic region that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $144.00.

(ii)   HCPCS Code L0452, a TLSO that provides trunk support in the upper thoracic region that is flexible, prefabricated and custom-fabricated, which has a maximum reimbursement rate of $330.85.

(iii)   HCPCS Code L0454, a TLSO that provides trunk support from the sacrococcygeal junction to above the T-9 vertebra that is flexible,

prefabricated, and custom-fitted, which has a maximum reimbursement rate of $270.00.

(iv)     HCPCS Code L0455, a TLSO that provides trunk support from the sacrococcygeal junction to above the T-9 vertebra that is flexible, prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $239.42.

(v)      HCPCS Code L0456, a TLSO that provides trunk support to the thoracic region with a rigid posterior panel that is flexible, prefabricated, and custom-fitted, which has a maximum reimbursement rate of $778.11.

(vi)     HCPCS Code L0457, a TLSO that provides trunk support to the thoracic region with a rigid posterior panel that is flexible, prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $686.57.

(vii)    HCPCS Code L0458, a TLSO made of a modular segmented spinal system with two rigid plastic shells that is prefabricated, which has a maximum reimbursement rate of $400.18.

(viii)   HCPCS Code L0460, a TLSO made of a modular segmented spinal system with two rigid plastic shells that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $400.18.

(ix)     HCPCS Code L0462, a TLSO made of a modular segmented spinal system with three rigid plastic shells that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $400.18.

(x)      HCPCS Code L0464, a TLSO made of a modular segmented spinal system with four rigid plastic shells that is prefabricated, which has a maximum reimbursement rate of $400.18.

(xi)     HCPCS Code L0466, a TLSO made of a rigid posterior frame and flexible soft anterior apron that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $280.02.

(xii)    HCPCS Code L0467, a TLSO made of a rigid posterior frame and flexible soft anterior apron that is prefabricated, which has a maximum reimbursement rate of $247.07.

(xiii)   HCPCS Code L0468, a TLSO made of a rigid posterior frame and flexible soft anterior apron with lateral strength provided by pelvic, thoracic, and lateral frame pieces that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $343.54

(xiv)    HCPCS Code L0469, a TLSO made of a rigid posterior frame and flexible soft anterior apron with lateral strength provided by pelvic, thoracic, and

lateral frame pieces that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $303.13

(xv)     HCPCS Code L0470, a TLSO made of a rigid posterior frame and flexible soft anterior apron with rotational strength provided by subclavicular extensions that is prefabricated, which has a maximum reimbursement rate of $402.39

(xvi)    HCPCS Code L0472, a TLSO made of a rigid anterior and lateral frame that is prefabricated, which has a maximum reimbursement rate of $295.00

(xvii)   HCPCS Code L0480, a TLSO made of a one-piece rigid plastic shell without interface liner that is custom fabricated, which has a maximum reimbursement rate of $900.00

(xviii)  HCPCS Code L0482, a TLSO made of a one-piece rigid plastic shell with interface liner that is custom fabricated, which has a maximum reimbursement rate of $1,442.24

(xix)    HCPCS Code L0484, a TLSO made of a one-piece rigid plastic shell without interface liner and with overlapping plastic for enhanced lateral strength that is custom fabricated, which has a maximum reimbursement rate of $1,432.83

(xx)     HCPCS Code L0486, a TLSO made of a one-piece rigid plastic shell with interface liner and overlapping plastic for enhanced lateral strength that is custom fabricated, which has a maximum reimbursement rate of $1,523.40.

(xxi)    HCPCS Code L0488, a TLSO made of a one-piece rigid plastic shell with interface liner that is prefabricated, which has a maximum reimbursement rate of $886.23

(xxii)   HCPCS Code L0490, a TLSO made of a one-piece rigid plastic shell with overlapping reinforced anterior that is prefabricated, which has a maximum reimbursement rate of $249.76

(xxiii)  HCPCS Code L0491, a TLSO made of a modular segmented spinal system with two rigid plastic shells that is prefabricated, which has a maximum reimbursement rate of $543.13

(xxiv)   HCPCS Code L0492, a TLSO made of a modular segmented spinal system with three rigid plastic shells that is prefabricated, which has a maximum reimbursement rate of $356.79.

200.    As unlicensed healthcare providers, the Supplier Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription for a "l.s.o support" or "TLSO".

201.    However, without contacting the Referral Defendants, the Supplier Defendants simply provided virtually every Insured with a prescription for an "l.s.o. support" the same lumbar orthotic and billed GEICO using HCPCS Code L0642 requesting a reimbursement of $283.76 for each unit, which resulted in hundreds of needlessly inflated charges to GEICO.

202.    Similarly, and again without contacting the Referral Defendants, the Supplier Defendants simply provided virtually every Insured with a prescription for a "TLSO" the same back support and billed GEICO using HCPCS Code L0490 requesting a reimbursement of $249.76 for each unit, which resulted in hundreds of needless inflated charged to GEICO.

203.    A similar pattern existed with respect to the prescriptions for knee support braces issued by the Referral Defendants. As described above, part of the predetermined fraudulent protocol involved Stracar's prescriptions for a "knee support".

204.    Even so, the vague and generic language for knee supports contained in the prescriptions directly relate to the over 15 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds, including:

> (i)     HCPCS Code L1810, a knee orthosis that is elastic with joints and that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $80.51.
>
> (ii)    HCPCS Code L1812, a knee orthosis that is elastic with joints and that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $71.04.
>
> (iii)   HCPCS Code L1820, a knee orthosis that is elastic with condylar pads and joints and that is prefabricated, which has a maximum reimbursement rate of $110.00.

(iv)   HCPCS Code L1830, a knee orthosis that is immobilizing and that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.00.

(v)   HCPCS Code L1831, a knee orthosis with a locking knee joint that is prefabricated, which has a maximum reimbursement rate of $208.13.

(vi)   HCPCS Code L1832, a knee orthosis that has adjustable knee joints and that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $607.55.

(vii)   HCPCS Code L1833, a knee orthosis that has adjustable knee joints and that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $536.08.

(viii)   HCPCS Code L1834, a knee orthosis that is rigid, without a knee joint, and that is custom fabricated, which has a maximum reimbursement rate of $595.41.

(ix)   HCPCS Code L1836, a knee orthosis that is rigid, without a knee joint, and that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $104.84.

(x)   HCPCS Code L1840, a knee orthosis that is for derotation of anterior cruciate ligament and that is custom fabricated, which has a maximum reimbursement rate of $597.50.

(xi)   HCPCS Code L1843, a knee orthosis that extends from thigh to calf with adjustable flexion and extension joint and that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $634.53.

(xii)   HCPCS Code L1844, a knee orthosis that extends from thigh to calf with adjustable flexion and extension joint and that is custom fabricated, which has a maximum reimbursement rate of $1,107.70.

(xiii)   HCPCS Code L1845, a knee orthosis with a double upright that extends from thigh to calf with adjustable flexion and extension joint and that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $693.00.

(xiv)   HCPCS Code L1846, a knee orthosis with a double upright that extends from thigh to calf with adjustable flexion and extension joint and that is custom fabricated, which has a maximum reimbursement rate of $828.18.

(xv)   HCPCS Code L1847, a knee orthosis with a double upright with adjustable joint and inflatable air support chambers and that is prefabricated and custom-fitted, which has a maximum reimbursement rate of $449.98.

(xvi)   HCPCS Code L1848, a knee orthosis with a double upright with adjustable joint and inflatable air support chambers and that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $397.04.

(xvii)   HCPCS Code L1850, a Swedish type knee orthosis that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $185.00.

(xviii)   HCPCS Code L1860, a knee orthosis with a modification of the supracondylar prosthetic socket that is custom fabricated, which has a maximum reimbursement rate of $617.00.

205.   As with the prescriptions for knee supports, the Supplier Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured that had a prescription for a "knee support".

206.   However, without contacting the Referral Defendants, the Supplier Defendants simply provided virtually every Insured with the same knee support and billed GEICO using HCPCS Code L1820 requesting a reimbursement of $110.00 for each unit, which resulted in hundreds of needlessly inflated charges to GEICO.

207.   In reality, the Supplier Defendants unlawfully prescribed the Fraudulent Equipment because they decided which specific items of DME and/or OD to provide to the Insureds. These decisions by the Supplier Defendants were not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME and/or OD; or (ii) the medical necessity of the specific items dispensed in relation to the Insureds. Rather, the decisions by the Supplier Defendants were solely based on their own financial enrichment. As a result, the Supplier Defendants were never eligible for reimbursement of No-Fault Benefits.

E.       **The Supplier Defendants' Fraudulent Billing for DME and/or OD**

208.     The bills submitted bills to GEICO and other New York automobile insurers by the Supplier Defendants were also fraudulent in that they misrepresented the DME and OD purportedly provided to the Insureds.

209.     In the bills and other documents submitted to GEICO, the Supplier Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to the unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants, either directly or through third-parties who are not presently known.

210.     Further, the Supplier Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon decisions made by laypersons.

211.     Moreover, and as explained below, the bills submitted to GEICO by the Supplier Defendants misrepresented, to the extent that any Fraudulent Equipment was provided: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

1)       **The Supplier Defendants' Fraudulently Misrepresented the Non-Fee Schedule items Purportedly Provided**

212.     When the Supplier Defendants' submitted bills to GEICO seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

213.    As indicated above, the New York Fee Schedule provides that the Medicaid Fee Schedule is used to determine the amount to pay for Fee Schedule items. The Medicaid Fee Schedule specifically defines the requirements for each HCPCS code used to bill for DME and/or OD.

214.    Additionally, Noridian provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS code for both Fee Schedule items and Non-Fee Schedule items.

215.    By submitting bills to GEICO containing specific HCPCS Codes the Supplier Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

216.    However, with the exception of codes relating to positioning pillows/cushions under HCPCS Code E0190, electric heating pads under HCPCS Code E0215, and two-piece cervical collars under HCPCS Code E0172, in virtually all of the bills submitted to GEICO for Fee Schedule items, the Supplier Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

217.    The prescriptions from the healthcare providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. By contrast, the Supplier Defendants' submitted bills to GEICO containing HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

218.    As indicated above, the predetermined fraudulent protocols due to unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the

Referral Defendants, provided the Supplier Defendants with the opportunity to increase the amount they could bill GEICO for Fraudulent Equipment purportedly provided to the Insureds.

219.    Accordingly, the Referral Defendants and other healthcare providers purposefully provided prescriptions to the Supplier Defendants that contained general categories of Fraudulent Equipment to purportedly provide to the Insureds.

220.    Based upon the vague and generic prescriptions that the Supplier Defendants received, the Supplier Defendants were able to choose between multiple types of products that would fit the vague description contained on the prescription.

221.    Although several options were available to the Supplier Defendants based upon the vague and generic prescriptions, the Supplier Defendants virtually always billed GEICO – and likely other New York automobile insurers – using HCPCS Codes with higher reimbursement amounts than necessary, which was done so for their financial benefit.

222.    However, despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the Supplier Defendants provided any Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

223.    For example, as identified in the claims contained within Exhibit "1", the Supplier Defendants used the vague and generic language in the prescriptions to bill GEICO for hundreds of lumbar orthotics under HCPCS Code L0642 with a charge of $283.86 per unit.

224.    However, the bills to GEICO for HCPCS Code L0642 fraudulently misrepresented the type of Fraudulent Equipment the Supplier Defendants purportedly provided to Insureds as the lumbar orthotics they provided – to the extent that the lumbar orthotics were actually provided – were not reimbursable under HCPCS Code L0642.

225.    HCPCS Code L0642 is a Fee Schedule item and is defined as follows:

> Lumbar orthosis, sagittal control, with rigid anterior and posterior panels, posterior extends from L-1 to below L-5 vertebra, produces intracavitary pressure to reduce load on the intervertebral discs, includes straps, closures, may include padding, shoulder straps, pendulous abdomen design, prefabricated, off-the-shelf

226.    Essentially, the product assigned to HCPCS Code L0642 is a back brace with rigid panels for the anterior and posterior parts of the lumbar spine.

227.    However, despite billing GEICO – and other New York automobile insurers – using HCPCS Code L0642, the specific lumbar orthotic provided by the Supplier Defendants – to the extent that the Supplier Defendants provided the Insureds with any lumbar orthotics – did not contain the requirements set forth in HCPCS Code L0642.

228.    Upon information and belief, the lumbar orthotics provided – to the extent that any were provided – were flexible materials that would have been properly billed under HCPCS Code L0625, which is a Fee Schedule item defined as follows:

> Lumbar Orthosis, flexible, provides lumbar support, posterior extends from L-1 to below L-5 vertebra, produces intracavitary pressure to reduce load on the intervertebral discs, includes straps, closures, may include pendulous abdomen design, shoulder straps, stays, prefabricated, off-the-shelf

229.    By contrast to the fraudulent charges for $283.86 for each lumbar-sacral orthotic under HCPCS Code L0642 – and in keeping with the fact that the fraudulent charges were part of the Supplier Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement amount of $43.27 for each unit under HCPCS Code L0625.

230.    In each of the claims identified within Exhibit "1" where the Supplier Defendants billed for Fraudulent Equipment under HCPCS Code L0642, each of the bills fraudulently

misrepresented that the Supplier Defendants provided the Insureds with equipment that satisfied the requirements of HCPCS Code L0642.

231.    Furthermore, the claims identified in Exhibit "1" for orthopedic car seat cushions under HCPCS Codes E1399 is another example of how the Supplier Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that Fraudulent Equipment were actually provided.

232.    Similar to the charges under HCPCS L0642, the Supplier Defendants used the vague and generic language in the prescriptions to bill GEICO for hundreds of orthopedic car seat cushions under HCPCS Code 1399 with a charge of $180.00 per unit.

233.    However, the bills to GEICO for "orthopedic car seat cushions" under HCPCS Code E1399 fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds as the seat cushions they provided – to the extent that the seat cushions were actually provided – were not reimbursable under either HCPCS Code E1399.

234.    HCPCS Code E1399 is a Non-Fee Schedule item, which has a reimbursement rate to that of a Non-Fee Schedule item, i.e. the lesser of the price to the general public or 150% of the provider's acquisition cost.

235.    By contrast, the car seat cushions provided by the Supplier Defendants – to the extent that the Supplier Defendants provided the Insureds with any car seat cushions – would have been properly billed under HCPCS Code E0190, which is a Fee Schedule item defined as a "positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

236.    Unlike the fraudulent charges for $180.00 for each car seat cushion under HCPCS Code E1399 – and in keeping with the fact that the fraudulent charges were part of the Supplier

Defendants' scheme to defraud GEICO and other automobile insurers – HCPCS Code E0190 is a Fee Schedule item with a maximum reimbursement rate of $22.04 for each unit.

237.    In each of the claims identified within Exhibit "1" where the Supplier Defendants billed for car seat cushions under HCPCS Code E1399, each of the bills fraudulently mispresented that the item purportedly provided the Insureds in order to obtain a higher reimbursement rate.

238.    The claims identified in Exhibit "1" for HCPCS Code E0272 is another example of how the Supplier Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

239.    Each of the claims identified within Exhibit "1" for HCPCS Code E0272 contained a charge for $155.52 based upon a prescription for a "egg crate mattress."

240.    However, the product represented by HCPCS Code E0272 is defined as a foam or rubber mattress.

241.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0272, the items provided by the Supplier Defendants – to the extent that the Supplier Defendants provided the Insureds with any item in response to the prescriptions for egg crate mattresses – were not foam or rubber mattresses as required by HCPCS Code E0272.

242.    Upon information and belief, by contrast, to the extent that any items were provided, they were mattress pads/toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code L0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

243.    Unlike the fraudulent charges for $155.52 for each egg crate mattress billed under HCPCS Code E0272 – and in keeping with the fact that the fraudulent charges were part of the

Supplier Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code L0199.

244.    In each of the claims identified within Exhibit "1" where the Supplier Defendants billed for Fraudulent Equipment under HCPCS Code E0272, each of the bills fraudulently mispresented that the Supplier Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0272.

245.    With the except of the specific HCPCS Codes identified above, in each of the claims for Fee Schedule items identified within Exhibit "1", to the extent that any Fraudulent Equipment was actually provided, the Supplier Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain, and where therefore not eligible to collect No-Fault Benefits in the first instance.

### 2)    The Supplier Defendants' Fraudulent Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items

246.    When the Supplier Defendants' submitted bills to GEICO for Non-Fee Schedule items the Supplier Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

247.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

248.    By submitting bills to GEICO for Non-Fee Schedule items, the Supplier Defendants represented that they requested permissible reimbursement amounts that were

calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

249.    However, in virtually all of the charges to GEICO identified in Exhibit "1" for Non-Fee Schedule items, the Supplier Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

250.    Instead, the Supplier Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

251.    The Supplier Defendants were able to perpetrate this scheme to fraudulently overcharged Non-Fee Schedule items by providing Insureds – to the extent that they actually provided any Fraudulent Equipment –with low-cost and low-quality Fraudulent Equipment.

252.    When the Supplier Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of the Supplier Defendants' acquisition cost of costly high-quality items. In actuality, the Supplier Defendants' legitimate acquisition cost for the low-quality items were significantly less.

253.    In an effort to further their scheme, upon information and belief, the Supplier Defendants, purposefully avoided researching the cost to the general public of the low-cost and low-quality Non-Fee Schedule items purportedly provided to the Defendants.

254.    Upon information and belief, the Supplier Defendants purposefully avoided researching the cost to the general public of the Non-Fee Schedule items that they purportedly

provided because they knew that those items would be sold at significantly less than charges they submitted to GEICO, and other automobile insurers.

255.    In keeping with the fact that the Supplier Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the Supplier Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by virtually never submitting a copy of their acquisition invoices in conjunction with their bills.

256.    Upon information and belief, the Supplier Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

257.    To the extent that the Supplier Defendants did submit invoices in conjunction with their bills to GEICO, upon information and belief, those invoices did not accurately represent the legitimate cost to acquire the Non-Fee Schedule items.

258.    In keeping with the fact that the Supplier Defendants attempted to conceal their scheme to overcharge GEICO for Non-Fee Schedule items, the Supplier Defendants regularly submitted two bills to GEICO for Non-Fee Schedule items purportedly provided to Insureds on a single date.

259.    For example, as stated above, subsequent to the Insureds' follow-up examinations at the Richmond Ave Clinic, the Supplier Defendants were provided with two separate prescriptions issued on the same date to a single Insured. One prescription was virtually always for a whirlpool, and the second prescription was for a massager, infrared heat lamp, EMS unit, an EMS belt.

260.    Although the Supplier Defendants received two separate prescriptions for a single Insured, the Supplier Defendants virtually always purportedly provided all of the Fraudulent Equipment identified on both prescriptions on a single date.

261.    Despite purportedly providing the Fraudulent Equipment identified on the two prescriptions to Insureds on a single date, the Supplier Defendants would submit two separate bills to GEICO seeking reimbursement for items provided on a single day.

262.    Similar to the lack of legitimacy for issuing multiple prescriptions on a single date to a single Insured, there is also no legitimate reason why the Supplier Defendants would submit multiple bills to GEICO for Fraudulent Equipment purportedly provided on a single date.

263.    Upon information and belief, the Supplier Defendants split the Non-Fee Schedule items purportedly provided to the Insureds on multiple bills in order to conceal the extent of the fraudulent charges for Non-Fee Schedule items billed to GEICO.

264.    As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibit "1" virtually always misrepresented the permissible reimbursement amount.

265.    For example, the Supplier Defendants billed GEICO for hundreds of EMS units under HCPCS Code L0745 with a charge of $678.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

266.    During GEICO's investigation into the Supplier Defendants, GEICO was able to examine the EMS units purportedly provided to the Insureds, which were billed under HCPCS Code L0745, and observed that the EMS units were low-quality items made in China. Upon further investigation, GEICO determined that the exact same low-quality model for the EMS

units provided to Insureds were available for purchase to the general public on the internet, as follows: (i) on Ebay for $28.99; and (ii) on MDsupplies.com for $35.99.

267.    In virtually all of the charges submitted to GEICO for EMS units, the Supplier Defendants fraudulently sought reimbursement for $678.00 per unit when the maximum reimbursement charge was no-greater than the cost to the general public at a price of $28.99 per unit.

268.    Similarly, the Supplier Defendants billed GEICO for hundreds of infrared heat lamps under HCPCS Code E0205 with a charge of $205.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

269.    During GEICO's investigation into the Supplier Defendants, GEICO was able to examine the infrared heat lamps purportedly provided to the Insureds, which were billed under HCPCS Code E0205, and observed that the heat lamps were low-quality items made in China. GEICO also determined that the exact same low-quality model for the infrared heat lamps provided to Insureds were available for purchase to the general public on the internet, as follows: (i) on 4mdmedical.com for $14.63; and (ii) on eBay for $31.99.

270.    In virtually all of the charges submitted to GEICO for infrared heat lamps, the Supplier Defendants fraudulently sought reimbursement for $205.00 per unit when the maximum reimbursement charge was no greater than the cost to the general public at $14.63 per unit.

271.    The Supplier Defendants' also billed GEICO for hundreds of massagers under HCPCS Code E1399 with a charge of $208.50 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

272.    During GEICO's investigation into the Supplier Defendants, GEICO was able to examine the massagers purportedly provided to the Insureds, which was billed under HCPCS

Code E1399, and observed that the massagers were low-quality items made in China. GEICO also determined that the exact same low-quality model infrared heat lamps were available for purchase to the general public on the internet at Walmart for $24.99.

273.    In virtually all of the charges submitted to GEICO for massagers, the Supplier Defendants fraudulently sought reimbursement for $208.50 per unit when the maximum reimbursement charge was no-greater than the cost to the general public at $24.99 per unit.

274.    Furthermore, the Supplier Defendants billed GEICO for hundreds of whirlpools under HCPCS Codes E1399 or E1300 with a charge of $409.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

275.    During GEICO's investigation into the Supplier Defendants, GEICO was able to examine the whirlpools purportedly provided to the Insureds, which were billed under HCPCS Codes E1399 and E1300, and observed that the whirlpools were low-quality items made in China. GEICO also determined that the exact same low-quality model whirlpools were available for purchase to the general public on the internet, as follows: (i) Amazon for $46.00; and (ii) Walmart's website for $39.00.

276.    In virtually all of the charges submitted to GEICO for massagers, the Supplier Defendants fraudulently sought reimbursement for $409.00 per unit when the maximum reimbursement charge was no-greater than the cost to the general public at $39.00 per unit.

277.    In each of the claims identified within Exhibit "1" for Non-Fee Schedule items, the Supplier Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for Non-Fee Schedule items were the lesser of 150% of the acquisition cost or the cost to the general public, and where therefore not eligible to collect No-Fault Benefits in the first instance.

III.     **The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

278.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of Med Equipments, seeking payment for Fraudulent Equipment.

279.    The NF-3 forms, HCFA-1500 forms and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Supplier Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Supplier Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with the healthcare providers, including the Referral Defendants, either directly or through third-parties who are presently unknown; and (b) predetermined fraudulent protocols without regard for the medical necessity of the items.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Supplier Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Supplier Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Supplier Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Supplier Defendants provided any Fraudulent Equipment to the Insureds –

falsified the permissible reimbursement amount for Non-Fee Schedule items identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

280.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

281.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

282.    Specifically, they knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – based upon predetermined fraudulent protocols as a result of unlawful financial arrangements, were provided to the Supplier Defendants, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

283.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon predetermined protocols and without medical necessity in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

284.    Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons, without legal authority to issue a prescription, and not by an actual healthcare provider, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

285.    Additionally, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Supplier

Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

286.   Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the Supplier Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

287.   Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate. Nevertheless, in an attempt to conceal their fraud, the Defendants failed and/or refused to respond to all of GEICO's requests for verification of the charges submitted.

288.   GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

289.   In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

290.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

291.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $375,000.00 based upon the fraudulent charges.

292.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Med Equipments
### (Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)

293.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 292 of this Complaint as if fully set forth at length herein.

294.    There is an actual case in controversy between GEICO and Med Equipments regarding more than $575,000.00 in fraudulent billing that has been submitted to GEICO in the name of Med Equipments.

295.    Med Equipments has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

296.    Med Equipments also has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially

enrich Med Equipments, the other Defendants, and others who are not presently known, rather than to treat the Insureds.

297.     Med Equipments has no right to receive payment for any pending bills submitted to GEICO because Med Equipments purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

298.     Med Equipments has no right to receive payment for any pending bills submitted to GEICO because – to the extent Med Equipments actually provided any Fraudulent Equipment – Med Equipments fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

299.     Med Equipments has no right to receive payment for any pending bills submitted to GEICO because – to the extent Med Equipments provided any Fraudulent Equipment – Med Equipments fraudulently misrepresented the permissible reimbursement rate for Non-Fee Schedule items as they submitted bills to GEICO with prices that were significantly more than the lesser of 150% of the legitimate acquisition cost or the price to the general public for each item.

300.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Med Equipments.

### SECOND CAUSE OF ACTION
**Against Ayzenberg**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

301.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 300 of this Complaint as if fully set forth at length herein.

302.    Med Equipment is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

303.    Ayzenberg knowingly conducted and/or participated, directly or indirectly, in the conduct of Med Equipments's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Med Equipments was not eligible to receive under the New York No-Fault Laws because: (i) Med Equipments submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Med Equipments submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols designed solely to financially enrich the Defendants; (iii) Med Equipments submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iv) to the extent that Med Equipments actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the Fee Schedule items actually provided; and (v) to the extent that Med Equipments actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule

items. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

304.    Med Equipments business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Ayzenberg operates Med Equipments, insofar as Med Equipments is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Med Equipments to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Ayzenberg continues to submit and attempt collection on the fraudulent billing submitted by Med Equipments to the present day.

305.    Med Equipments is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Med Equipments in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

306.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $375,000.00 pursuant to the fraudulent bills submitted through Med Equipments.

307.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Against Ayzenberg, Apple, Burt, Stracar, and John Doe Defendants 1-10
### (Violation of RICO, 18 U.S.C. § 1962(d))

308.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 307 of this Complaint as if fully set forth at length herein.

309.    Med Equipments is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

310.    Ayzenberg, Apple, Burt, Stracar, and John Doe Defendants 1-10 are owners of, employed by, or associated with the Med Equipment enterprise.

311.    Ayzenberg, Apple, Burt, Stracar, and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Med Equipments's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Med Equipments was not eligible to receive under the New York No-Fault Laws because: (i) Med Equipments submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Med Equipments submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols designed solely to financially enrich the Defendants; (iii) Med Equipments submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iv) to the extent that Med Equipments actually provided Fraudulent Equipment to the Insureds, the bills to GEICO

fraudulently mischaracterized the Fee Schedule items actually provided; and (v) to the extent that Med Equipments actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule items. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".  Each such mailing was made in furtherance of the mail fraud scheme.

312.    Ayzenberg, Apple, Burt, Stracar, and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

313.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $375,000.00 pursuant to the fraudulent bills submitted through Med Equipments.

314.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Med Equipments and Ayzenberg**
**(Common Law Fraud)**

315.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 313 of this Complaint as if fully set forth at length herein.

316.    Med Equipments and Ayzenberg intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the

course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

317.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iii) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fee Schedule items accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact Fee Schedule items did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, the charges for Non-Fee Schedule items contained in the bills to GEICO misrepresented the permissible reimbursement amount.

318.    Med Equipments and Ayzenberg intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Med Equipments that were not compensable under the No-Fault Laws.

319.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $375,000.00 pursuant to the fraudulent bills submitted by the Supplier Defendants through Med Equipments.

320.     The Supplier Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

321.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
**Against Med Equipments and Ayzenberg**
**(Unjust Enrichment)**

322.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 321 of this Complaint as if fully set forth at length herein.

323.     As set forth above, the Supplier Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

324.     When GEICO paid the bills and charges submitted by or on behalf of Med Equipments for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Supplier Defendants' improper, unlawful, and/or unjust acts.

325.     The Supplier Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Supplier Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

326.     The Supplier Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

327.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $375,000.00.

## SIXTH CAUSE OF ACTION
### Against Apple, Burt, Stracar, and John Doe Defendants 1-10
### (Aiding and Abetting Fraud)

328.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 327 of this Complaint as if fully set forth at length herein.

329.    Apple, Burt, Stracar, and John Doe Defendants 1-10 knowingly aided and abetted the fraudulent scheme perpetrated against GEICO by the Supplier Defendants.

330.    The acts taken by Apple, Burt, Stracar, and John Doe Defendants 1-10 in furtherance of the fraudulent scheme include knowingly: (i) provided prescriptions for Fraudulent Equipment that were billed to GEICO by the Supplier Defendants as a result of unlawful financial arrangements; (ii) provided prescriptions for Fraudulent Equipment that were billed to GEICO by the Supplier Defendants pursuant to predetermined fraudulent protocols and without regard for medical necessity; (iii) provided prescriptions for Fraudulent Equipment that were intentionally generic and vague so as to allow the Supplier Defendants to unlawfully decide the specific type of Fraudulent Equipment to purportedly provide Insureds, and subsequently bill GEICO; (iv) participated in each of the foregoing acts with knowledge that the prescriptions would be used by the Supplier Defendants to support their fraudulent claims; and (iv) ensured that the prescriptions for Fraudulent Equipment were given to the Supplier Defendants rather than to the patients.

331.    The conduct of Apple, Burt, Stracar, and John Doe Defendants 1-10, as more fully described above, were in furtherance of the fraudulent scheme and were significant and material.

332.     The conduct of Apple, Burt, Stracar, and John Doe Defendants 1-10, as more fully described above, were a necessary part of and were critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for the Supplier Defendants to bill GEICO for Fraudulent Equipment.

333.     Apple, Burt, Stracar, and John Doe Defendants 1-10 each aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges for Fraudulent Equipment that were not compensable under the No-Fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

334.     The conduct of Apple, Burt, Stracar, and John Doe Defendants 1-10 caused GEICO to pay money based upon the fraudulent charges submitted to it through Med Equipments in an amount to be determined at trial, but in no event less than $375,000.00.

335.     The extensive fraudulent conduct of Apple, Burt, Stracar, and John Doe Defendants 1-10 demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

336.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

337.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Med Equipments, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Med Equipments has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of action against Ayzenberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $375,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Ayzenberg, Apple, Burt, Stracar, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $375,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Med Equipments and Ayzenberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $375,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Med Equipments and Ayzenberg, more than $375,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

F.     On the Sixth Cause of Action against Apple, Burt, Stracar, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $375,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: July 27, 2020
        Uniondale, New York

                                    RIVKIN RADLER LLP


                                    By:    */s/ Barry Levy*
                                           Barry I. Levy (BL 2190)
                                           Michael A. Sirignano (MS 5263)
                                           Michael Vanunu (MV 4167)
                                           Philip Nash (PN 0519)
                                    926 RXR Plaza
                                    Uniondale, New York 11556
                                    (516) 357-3000

                                    *Counsel for Plaintiffs Government Employees*
                                    *Insurance Company, GEICO Indemnity Company,*
                                    *GEICO General Insurance Company and GEICO*
                                    *Casualty Company*

4852573.v4